**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 11-cv-03025-CMA-CBS

DON ANGELL,

      Plaintiff,

v.

FAIRMOUNT FIRE PROTECTION DISTRICT,

      Defendant.

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. # 15.)  In this case, Plaintiff brings three employment-related claims: (1) a claim under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(a); (2) a common-law tort claim for retaliation, for filing a claim for benefits under the Workmen's Compensation Act; and (3) a constitutional Due Process claim.  (Doc. # 10, ¶¶ 3-4.)

## I. BACKGROUND

The following facts are undisputed, unless otherwise noted.

Plaintiff Don Angell was the fire chief of the Fairmount Fire Protection District ("FFPD"), located in Golden, Colorado, when he was terminated on March 31, 2011. (Doc. ## 10, ¶ 8; 15, ¶ 1.)  FFPD is governed by a five-member Board of Directors ("the Board").  (Doc. # 10, ¶ 12.)  As a source of additional revenue, FFPD participated in "prescribed burns"; FFPD would receive compensation for providing personnel and

equipment to burn agricultural and ranching lands.  (Doc. # 15, ¶ 2.)  FFPD participated

in these prescribed burn projects since at least 2008.  (*Id.,* ¶ 3.)

At an August 26, 2009 Board meeting, Plaintiff presented a new business

venture to the Board, in which FFPD would conduct prescribed burns in Nebraska,

Kansas, and Oklahoma, with an entity called "Up in Smoke" ("UIS").  (*Id.,* ¶ 4.)  At that

Board meeting, Plaintiff told the Board he would have FFPD's attorney, Jim Petrock

("Petrock") "look things over and come up with an agreement for both parties."[1]  (*Id.; see*

*also* Doc. #15-1 at 4.)   The Board minutes stated that "part of the cost of this venture

would be the need to purchase a mower and tiller at an approximate cost of $20,000.00

. . . the Board unanimously voted to approve the purchase of the mower [and] tiller and

move forward to pursue this joint venture for [p]rescribed [burn] opportunities with Up in

Smoke."  (Doc. # 15-1 at 4.)  Since at least late 2009 and early 2010, FFPD conducted

prescribed burns with UIS, and incurred expenses for the prescribed burn operations.

(Doc. # 15, ¶ 8.)  However, Petrock did not draft an agreement with UIS, and an

agreement was never signed by UIS or FFPD.  (Doc. ## 15, ¶ 6; 15-4 at 2.)  Addi-

tionally, FFPD never received payment for the work it performed with UIS,[2] and the

---

[1]  The parties dispute whether Plaintiff actually provided Petrock with the information relating to
the possible agreement with UIS, including one page of "general contract terms for the project."
(*Compare* Doc. # 15, ¶¶ 5-6 *with* Doc. # 20 at 3-7; *see also* Doc. # 20-7.)  In any case, it is
undisputed that an official, binding contract was never signed by UIS and FFPD.  (Doc. # 15,
¶ 6; 15-4 at 2.)

[2]  Plaintiff disputes this fact and submits that "staff member Russ Lewis testified that payments
were received [from UIS] . . . in previous years," and cites to page 115 of Lewis' deposition in
support of this proposition.  (Doc. # 20 at 9.)  However, Plaintiff did not submit this page in its
exhibit materials; as such, the fact remains undisputed.

project ultimately resulted in a loss to the FFPD of approximately $208,000.  (Doc. ## 15-8 at 6; 20-4 at 2; 20-5 at 2.)

Plaintiff was diagnosed with cancer in September of 2010.  (Doc. # 15, ¶ 16.) He filed a workers' compensation claim on October 17, 2010, relating to his cancer. (Doc. # 15-29.)  Additionally, he underwent multiple surgeries for his cancer.  (Doc. # 20, ¶ 7.)  At some point prior to being fired,[3] Board Chairman Craig Corbin ("Corbin") instructed Plaintiff he "could not go out on [emergency] calls."[4]  (Doc. ## 20-2, ¶ 13; 20-26 at 3.)

At a March 9, 2011 Board meeting, the Board and Plaintiff again discussed the prescribed burn project with UIS.  (Doc. #15-8 at 5-8.)  According to the Board minutes of that meeting, Plaintiff admitted to the Board that he "'blew' the prescribed fire for the 2010 season and that the 'buck stops with him on everything that happens with this District.'"  (*Id.* at 5.)  Additionally, the Board minutes reflect that Plaintiff told the Board that FFPD "had a contract" with UIS, and that the contract was a written contract; later, when Board Member Craig Corbin ("Corbin") stated he didn't remember signing a contract, Plaintiff told the Board that "we discussed it, we reviewed it, we had it and we even had it in the minutes and so forth, a simple one page agreement."  (*Id.* at 5, 6.)

---

[3]  Plaintiff's affidavit does not specify when this exchange between Plaintiff and Corbin occurred, but his affidavit indicates that it was when he returned to work after his first surgery. (Doc. # 20-2, ¶ 13.)  Elsewhere, Plaintiff alleges that his first cancer surgery occurred in November of 2010.  (Doc. # 20-2, ¶ 7.)  However, Corbin's deposition indicates that this comment from Corbin regarding emergency calls occurred in February of 2011 (Doc. # 20-26 at 3), and Plaintiff's Opposition Brief cites to Corbin's deposition as proof the comment was made (Doc. # 20, ¶ 9).

[4]  It is unclear whether Plaintiff actually followed this direction to stop responding to emergency calls; in any case, it is uncontested that he continued working and performing his job duties in at least some fashion until he was terminated.

However, on March 18, 2011, in a letter to Petrock, Plaintiff wrote, "there is no

'Contract' [with UIS][,] only this working agreement to which all parties had agreed."

(Doc. # 15-4.)  A day later, Plaintiff was suspended with pay.  (Doc. # 15, ¶ 14.)  The

Board met again on March 30, 2011 to discuss whether to terminate Plaintiff.[5]  (Doc.

# 15-12.)  The next day, the Board terminated Plaintiff, effective April 1, 2011.  (Doc.

# 15-9.)  The Board's March 31, 2011 letter to Plaintiff explained that he had been

terminated because "[t]he Board of Directors found that you entered into a contract

without formal Board approval.  This action has resulted in an approximately

$200,000.00 loss . . . .  This loss has placed FFPD and our community in a position

of 'lack of trust' in your leadership and guidance."  (*Id.*)

FFPD has an "Employee Guidelines Manual" ("the Employee Manual"), which

provides, on the first page, that:

> These guidelines are not a contract and impose no legally enforceable
> obligations on [D]istrict [sic].  All District employees are employed at will.
> Employees, or District, may terminate the employment relationship at
> any time, with or without prior notice, warning, procedure, or formality,
> for any reason or no reason . . . .  The nature, terms or conditions of
> District employees' employment cannot be changed by oral representa-
> tion, custom, habit or practice, or any other writing.  In the event of conflict
> between this disclaimer and any other statement, oral or written, present
> or future, concerning terms and conditions of employment, the at-will
> relationship confirmed by this disclaimer shall control.

(Doc. # 15-18 at 3.)  Additionally, the Employee Manual provides a "Grievance

Procedure," which states:

> If an employee is dissatisfied with their supervisor's verbal decision [as
> to an employment action], the employee must submit the grievance in
> writing to the Fire Chief within seven business days from the date of the

---

[5] Defendant also submitted an audio recording of this meeting, which the Court has reviewed.

4

supervisor's verbal decision.  The Chief will investigate the grievance to the fullest extent and furnish a written decision to the employee within five business days after receipt of the grievance.

(*Id.* at 4.)  Additionally, the Employee Manual states that "if any employee is not satisfied with the Chief's written response to their grievance, the employee may appeal in writing to the Board within seven days from the date of the Chief's written decision, with the employee's agreement to appear personally before the Board to discuss the grievance."  (*Id.* at 4-5.)

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 272, 248 (1986)).  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."  *Id* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Id.* at

670-71. In attempting to meet that standard, a movant who does not bear the ultimate

burden of persuasion at trial need not disprove the other party's claim; rather, the

movant need simply point out to the court a lack of evidence for the other party on

an essential element of that party's claim.  *Id.* at 671 (citing *Celotex Corp. v. Catrett*,

477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving

party "to set forth specific facts showing that there is a genuine issue for trial."

*Anderson*, 477 U.S. at 256.  The nonmoving party may not simply rest upon its

pleadings to satisfy its burden.  *Id.*  Rather, the nonmoving party must "set forth specific

facts that would be admissible in evidence in the event of trial from which a rational trier

of fact could find for the nonmovant."  *Adler*, 144 F.3d at 671.  To accomplish this, the

facts must be identified by reference to affidavits, deposition transcripts, or specific

exhibits incorporated therein.  *Id.*

### III. <u>ANALYSIS</u>

**A.    PLAINTIFF'S AMERICANS WITH DISABILITIES ACT ("ADA") CLAIM**

The ADA prohibits discrimination against a "qualified individual with a disability

on the basis of the disability."  *Valdez v. McGill*, 462 F. App'x 814, 817 (10th Cir. 2012)

(quoting 42 U.S.C. § 12112(a)).  To establish a *prima facie* case of discrimination under

the ADA, a plaintiff must show that: (1) he is a disabled person as defined by the ADA;

(2) he is qualified, with or without reasonable accommodation, to perform the essential

functions of the job held; and (3) his employer discriminated against him because of his

disability.  *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1217 (10th Cir. 2010); *see also MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (same).

Where, as here, a plaintiff seeks to establish an ADA violation through circum-stantial evidence, the Court applies the three-step analytical framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Mackenzie*, 414 F.3d at 1274.  Under *McDonnell Douglas*, Plaintiff must first establish a *prima facie* case of discrimination.  If Plaintiff can do so, "the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision.  Should the defendant articulate a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether defendant's reason for the discharge is pretextual."  *Johnson,* 594 F.3d at 1217 (citation omitted).  However, at all times, the plaintiff bears the ultimate burden of proving discrimination.  *Butler v. City of Prairie Vill., Kan.*, 172 F.3d 736, 748 (10th Cir. 1999) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508, 515-16 (1993)).

1. Whether Plaintiff Was Disabled Under the Americans With Disabilities Amendments Act ("ADAAA")

The ADA defines the term "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities . . . (B) a record of such an impairment; or (C) being regarded as having such an impairment."[6]  42 U.S.C.A. § 12102(1).

---

[6]  Here, Plaintiff alleges he was "disabled" under both (A) and (C) – the "impairment" prong and the "regarded as" prong.  However, because Plaintiff provides sufficient evidence that he was actually impaired due to his cancer, the Court need not examine whether he also meets the "regarded as" prong.

It is undisputed that Plaintiff was diagnosed with cancer in September of 2010. (Doc. # 13, ¶ 16.)  The Tenth Circuit has not decided an ADA-related case involving cancer since the ADAAA became effective on January 1, 2009.  *See Rhodes v. Langston Univ.*, 462 F. App'x 773, 777 (10th Cir. 2011).  However, Congress passed the ADAAA with the explicit purpose of "reinstating a broad scope of protection . . . under the ADA," Pub. L. No. 110–325 § 2(b)(1), 122 Stat. 3553–3554 (2008), and stated that "it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."[7]  *Id.* § 2(b)(5).  To that end, the ADAAA added language to the ADA providing for a broad construction of the definition of disability.  42 U.S.C. § 12102(4)(A) ("The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.").

Pertinent to this case, the ADAAA provides that "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." *Id.* § 12102(4)(D).  Additionally, the definition of a "major life activity" was specifically expanded in the ADAAA, to include "operation of a major bodily function, including . . . normal cell growth."  *Id.* § 12102(2)(B).  As the Equal Employment Opportunities

---

[7]  *See also* 29 C.F.R. § 1630.4, App. ("We hope this will be an important signal to both lawyers and courts to spend less time and energy on the minutia of an individual's impairment, and more time and energy on the merits of the case – including whether discrimination occurred because of the disability . . . .") (internal quotation omitted.)

8

Coalition ("EEOC") implementing regulations state,[8] "it should easily be concluded that . . . cancer substantially limits [the major life activity of] normal cell growth" and accordingly, constitutes a disability.  29 C.F.R. § 1630.2(j)(3)(iii).

Based upon the ADAAA and the EEOC's post-enactment regulations, several courts have held that a Plaintiff's cancer is a disability for purposes of the ADAAA, even when the cancer is in remission.  *See Norton v. Assisted Living Concepts, Inc.*, 786 F. Supp. 2d 1173, 1185 (E.D. Tex. 2011) (remissive cancer is a disability under the ADAAA); *Hoffman v. Carefirst of Fort Wayne, Inc.*, 737 F. Supp. 2d 976, 985-86 (N.D. Ind. 2010) (same); *Chalfont v. U.S. Electrodes*, No. 10-2929, 2010 WL 5341846, at *9 (E.D. Pa. Dec. 28, 2010) (unpublished) (same).  Here, it is undisputed that Plaintiff was diagnosed with cancer, and that he underwent surgeries and treatment for his cancer; therefore, Plaintiff has adequately alleged that he had a disability under the ADA.

2.    Whether Plaintiff Was Qualified to Perform the Essential Functions of His Job

In its Motion for Summary Judgment, Defendant does not dispute Plaintiff's qualifications for the job of fire chief, or state that his disability meant that he could no longer perform the essential functions of his job.  (*See* Doc. # 15 at 9-11.)  However, in its Reply – for the first time – Defendant argues that Plaintiff's "gross fiduciary failures" in failing to obtain a contract with UIS demonstrated that he was unable to perform the essential functions of his job.  (Doc. # 26 at 16.)  Even if the Court were to consider this

[8]  "The authority to issue regulations granted to the Equal Employment Opportunity Commission . . . under this Act includes the authority to issue regulations implementing the definitions of disability. . . consistent with the ADA Amendments Act of 2008."  42 U.S.C. § 12205a.

argument,[9] it is entirely irrelevant to the issue of whether Plaintiff was qualified to perform the essential functions of his job.  To make this determination under the ADA, courts look at whether any reasonable accommodation would enable the employee to perform an essential job function.  *Hennagir v. Utah Dept. of Corr.*, 587 F.3d 1255, 1264 (10th Cir. 2009).  It makes little sense to ask whether the Defendant should or should not be able to "reasonably accommodate" Plaintiff's failures to obtain a contract, as his failure to do so does not stem from his disability.  Indeed, Defendant asserts that it fired him for reasons **other than** disability, demonstrating that it believed Plaintiff's disability did not disqualify him from performing his job.  Thus, the Court finds that Plaintiff has shown that he was qualified to perform the essential functions of his job.  *Compare, e.g., E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 986-87 (10th Cir. 2012) (affirming summary judgment that congenitally deaf employee could not perform "essential functions" of job in a photography store, because employee could only communicate with customers using gestures, pantomime, and written communication).

     3.    <u>Whether Defendant Discriminated Against Plaintiff Because of His Disability</u>

To establish the third element of a *prima facie* case of disability discrimination, Plaintiff must show that the employer terminated him "under circumstances which give rise to an inference that the termination was based on [his] disability."  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).  "This formulation [of the third prong] should

---

[9]  "[R]eply briefs reply to arguments made in the response brief – they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration."  *Home Design Services, Inc., v. B & B Custom Homes*, 509 F. Supp. 2d 968, 971 (D. Colo. 2007).

not be interpreted as diminishing the plaintiff's burden in proving her *prima facie* case. While the burden is not onerous, it is also not empty or perfunctory." *Butler v. City of Prairie Vill., Kan.*, 172 F.3d 736, 747-49 (10th Cir. 1999) (internal quotation omitted). To meet the third prong, a plaintiff must present "some **affirmative evidence** that disability was a **determining factor** in the employer's decision." *Morgan,* 108 F.3d at 1323-24 (emphasis added).  In other words, "[t]he plaintiff must present evidence that, if the trier of fact finds it credible, and the employer remains silent, she would be entitled to judgment as a matter of law." *Id.* at 1324 (internal citation omitted).

In this case, Plaintiff has not presented any "affirmative evidence" that his disability was a "determining factor" in the Defendant's decision to terminate him. Plaintiff has alleged that he was disabled and that Defendant was aware of his disability, but mere awareness of disability, without more, is not sufficient to show that disability was a "determining factor" in the employer's adverse action.  *Ainsworth v. Indep. Sch. Dist. No. 3 of Tulsa Cnty., Okla.*, 232 F. App'x 765, 771 (10th Cir. 2007) ("it does not follow that a reasonable inference of discrimination may be drawn from mere awareness of a disability or that mere awareness is affirmative evidence that may establish the third element of the *prima facie* case); *see also Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1219 (10th Cir. 2007) ("An employer's knowledge of an impairment alone is insufficient to establish the employer regarded the employee as disabled.") .

Beyond mere awareness, the only other piece of evidence arguably showing a causal connection between Plaintiff's disability and his termination was Chairman Corbin's comment to Plaintiff, upon returning from surgery, that Plaintiff "could not go

out on [emergency] calls." (Doc. # 20-2, ¶ 13.)  It is hard to perceive how this comment evinces discriminatory animus, as it was made out of concern for Plaintiff's health.  In any event, "[e]vidence demonstrating discriminatory animus in the decisional process needs to be distinguished from stray remarks in the workplace . . . or statements by decisionmakers unrelated to the decisional process."  *McCrary v. Aurora Pub. Sch.*, 57 F. App'x 362, 367 (10th Cir. 2003).  For a statement to constitute evidence of discrimination (rather than a "stray remark"), the plaintiff must show that it was "made by a decision maker, and that there was a nexus between the discriminatory statement[] and the decision to terminate."  *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998).  Although Corbin, as a member of the Board, had some decision-making power regarding Plaintiff's employment, Plaintiff provided no evidence of a causal nexus between the statement and the Defendant's decision to terminate Plaintiff. Indeed, the comment occurred at least a month prior to Plaintiff's termination on March 31, 2011,[10] and the explanation for his termination in no way referenced – even implicitly – concerns about Plaintiff's ability to respond to emergency calls or otherwise perform his job duties.  Accordingly, the statement does not constitute evidence of disability discrimination.  *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006) (finding a comment to be a "stray remark" where "[t]he remark was made by only one of the four individuals that decided to terminate [plaintiff], and no overt racial animus

---

[10]   Plaintiff did not provide an exact date for when Corbin told him he could not answer emergency calls, and as described in note 3, *supra*, it is unclear when this exchange occurred. However, viewing the evidence in the light most favorable to Plaintiff, the Court assumes that the comment occurred on February 28, 2011 (rather than in November of 2010).

is attributed to any of the other decisionmakers.  Further, the remark was temporally remote from the termination").

Plaintiff presents no other affirmative evidence that his disability was a "determining factor" in his termination.  At best, there is weak evidence of temporal proximity, because Plaintiff was terminated approximately five months after his cancer diagnosis.[11]  However, the passage of five months between Plaintiff's cancer diagnosis and his termination is too attenuated – without more – for Plaintiff to establish that there was a causal connection.  *See Meiners v. Univ. of Kan.,* 359 F.3d 1222, 1231 (10th Cir. 2004) (internal quotation omitted) ("Unless an adverse action is very closely connected in time to the protected activity, a plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation.  . . . [A] three-month period, standing alone, is insufficient"); *Ainsworth,* 232 F. App'x at 772, n.4 (quotation omitted) (holding that, standing alone, even very close temporal proximity cannot "operate as a proxy for [a plaintiff's] evidentiary requirement" and is insufficient to carry a plaintiff's  "burden on the third prong of his *prima facie* case").

For these reasons, the Court finds that Plaintiff cannot establish he was discriminated against "because of" his disability, and therefore that he has not established a *prima facie* case of discrimination.

---

[11]  It is unknown when, exactly, Plaintiff notified Defendant of his cancer diagnosis, which he alleges he received sometime in September of 2010.  (Doc. # 15, ¶ 15.)  However, Plaintiff filed a workers' compensation claim relating to his cancer on October 17, 2010 (Doc. # 15-29), effectively giving Defendant notice, at the latest, as of that date.

4.    Whether Defendant's Legitimate, Nondiscriminatory Reason for Plaintiff's Termination Was Pretextual.

Even assuming that Plaintiff established a *prima facie* case, the Defendant here has alleged a legitimate, nondiscriminatory reason for Plaintiff's termination, and Plaintiff has not shown that the Defendant's reason is pretextual.  *See Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1260 (10th Cir. 2001).  Pretext can be demonstrated by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Morgan*, 108 F.3d at 1323 (internal quotation omitted).  However, "mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment," *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988), and "a plaintiff's allegations alone will not defeat summary judgment."  *Morgan*, 108 F.3d at 1324.  "When assessing whether [a] plaintiff has made an appropriate showing of pretext, [the court] must consider the evidence as a whole." *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002).  Additionally, the Supreme Court has instructed that an employer would be entitled to summary judgment "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

Here, Plaintiff argues that Defendant's justifications for Plaintiff's termination were inconsistent and contradictory, insofar as Defendant claimed it fired Plaintiff for both failing to enter into, and for entering into, a contract with UIS.  Further, Defendant claimed that the FFPD's monetary loss from the failure of the UIS project both was – and was not – the reason for Plaintiff's termination.  Plaintiff points to three sources of arguable inconsistencies in Defendant's explanations:

- First, in its March 31, 2011 letter, Defendant stated that Plaintiff was terminated because "the Board of Directors found that you entered into a contract without formal Board approval.  This action has resulted in an approximately $200,000.00 loss . . . This loss has placed FFPD and our community in a position of 'lack of trust' in your leadership and guidance."  (Doc. # 15-9.)

- Second, Board Member Corbin's testimony:

    o   Corbin testified that Plaintiff was terminated because he "had entered into a contract without formal Board approval and cost the taxpayers about $200,000."  (Doc. # 20-8 at 26:25-27:3.)

    o   When asked, hypothetically, if the contract had made money, whether Plaintiff would have still lost his job, Corbin responded "No. . . . [Because] [t]here was no contract." (*Id.* at 27:4-9.)  Corbin then explained that the Board only became aware of the fact there was no contract in March of 2011, and that "[Plaintiff] was supposed to have a contract that outlined the details of the work to be provided by Fairmount Fire, and he was

supposed to get with Mr. Petrock to formulate that contract, and he did not

do that." (*Id.* at 27:14-23.)

- Third, Mark Herblan, another Board member, was asked at his deposition

    whether "Mr. Angell [was] terminated because this particular project lost

    significant amounts of district taxpayer funds?" (Doc. # 20-10 at 27:12-28:4.)

    Herblan responded:

    > No. That -- that was not the reason. The reason . . . that he was
    > terminated, was [his] failure to proceed, create the contract/agree-
    > ment that he indicated to us he would produce with [Mr. Petrock's
    > cooperation], and to be able to present that to the Board for review
    > and subsequent approval. That never took place. Mr. Angell
    > apparently took it upon himself, without a signed agreement, contract,
    > certainly with no Board approval, to enter into this agreement with
    > Up In Smoke, again, resulting in the loss to the District in excess
    > of a quarter of a million dollars, and leaving us without the lega
    >  teeth to pursue payment. (*Id.*)

However, these explanations, to the extent they are inconsistent, merely reflect

the confusion surrounding whether a formal, binding contract existed with UIS. This

confusion was justifiable given Plaintiff's own assertions at the March 2011 Board

meeting that a written contract existed and had been signed, and his later assertion in

writing, that only an unsigned "working agreement" existed. (*See* Doc. ## 15-4; 15-8

at 5-6.) Additionally, Corbin and Herblan's statements – that the failure to obtain a

contract was the central cause of Plaintiff's termination – are not inconsistent with the

termination letter's citation to a significant monetary loss as a reason (not the reason)

for termination.

Plaintiff contends that another portion of Corbin's testimony is evidence of

pretext. Corbin stated that, at one point, he had believed that the FFPD's burn work

16

with UIS was being done on a "deployment-type" basis,[12] as had been done in the past,

and that this was "fine" with the Board.  (Doc. # 20-8 at 97:4-16).   However, this fact is

not actually inconsistent with the Board's ultimate reasoning for firing Plaintiff, in that

Plaintiff **continued** to do work with UIS without getting a contract signed.   Indeed,

Corbin testified that the Board also understood that while work might have been done

on a "deployment-type" basis before a contract was signed, the Board still believed a

contract would be signed.  (*See id.* at 96:22-97:1).   Such reasoning is supported by the

fact that Plaintiff told the Board in August of 2009 that he would work with FFPD's

attorney, to "come up with an agreement for both parties" (Doc. #15-1 at 4), and Plaintiff

fails to provide any evidence that something occurred in the interim year and a half

indicating he no longer had an obligation to do so.[13]

Ultimately, it is uncontested that Plaintiff did not take the steps he was supposed

to and promised to take in securing a contract with UIS, and that his failure to secure a

---

[12]   Both parties agree that a "deployment-type" basis meant that the FFPD would deploy firefighters and equipment, and send an invoice to UIS after performing the work, rather than having an *ex ante* contract. (Doc. ## 20, ¶ 28; 26, ¶ 5.10.)

[13]   Plaintiff also points to his own performance record as evidence of pretext.  For example, Plaintiff points to the fact that he earned $205,000 in profits for FFPD in the same year he was terminated, even after the UIS losses were factored in to the FFPD's budget; he also states that he had been the fire chief for ten years and had (in his own estimation) done an "outstanding" job.  (Doc. # 20, ¶¶ 1, 24.)  However, Plaintiff submitted no independent evidence of his job performance, and "[a]n employee's own opinions . . . about his or her qualifications do not establish a material factual dispute on the issue of pretext."  *Webb v. Level 3 Commc'ns, LLC*, 167 F. App'x 725, 730 (10th Cir. 2006); *see also Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996) ("It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance.") (citation omitted); *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1065–66 (10th Cir. 2009) (when supervisor's comments about problems with employee are consistent with the listed reasons for termination, the court is "in no position to state that the numerous documented failures by the [employee] were not serious enough to justify termination.").

contract led to significant losses for the FFPD.  To the extent there are inconsistencies

in the Board member's statements, such inconsistencies are extremely minor and do

not demonstrate that Defendant's explanation was "unworthy of credence."  *Morgan*,

108 F.3d at 1323.  At most, Plaintiff has "created only a weak issue of fact as to whether

the employer's reason was untrue and there [is] abundant and uncontroverted inde-

pendent evidence that no discrimination had occurred."  *Reeves,* 530 U.S. at 148.

Although the Court has found that Plaintiff cannot establish a *prima facie* case of

discrimination on the basis of disability, the Court also finds that Plaintiff has failed to

provide sufficient evidence that Defendant's legitimate, nondiscriminatory reason was

pretextual.  Thus, Defendant is entitled to summary judgment on Plaintiff's ADA claim.[14]

## B.    PLAINTIFF'S RETALIATION CLAIM

Under the Workmen's Compensation Act of Colorado, Colo. Rev. Stat. §§ 8-40-

101 through 8-66-112, employers have a publicly-imposed duty to compensate

employees for work-related injuries, and employees have a statutory right to such

compensation.  *Lathrop v. Entenmann's, Inc*., 770 P.2d 1367, 1372 (Colo. App. 1989).

An employer's retaliation against an employee for his exercise of this statutory right

gives rise to a common law tort claim by the employee.  *Id.* at 1373; *see also Martin*

*Marietta Corp. v. Lorenz,* 823 P.2d 100, 108 (Colo. 1992) (citing *Lathrop* with approval).

---

[14]   Plaintiff also alleges violations of "the parallel Colorado Anti-Discrimination Law" (Doc. # 10 at 6) – presumably, Colo. Rev. Stat. § 24-34-402 – which prohibits employment discrimination, in relevant part, "because of disability."  However, Colorado and federal law apply the same standards to discrimination claims, such that the claims "rise or fall" together.  *See Colo. Civil Rights Comm'n v. Big O Tires, Inc.,* 940 P.2d 397, 400 (Colo. 1997); *Johnson*, 594 F.3d at 1219 n.11.  Therefore, Defendant is also entitled to summary judgment on Plaintiff's state law claims.

To assert a public policy-based common law claim for retaliatory discharge, a plaintiff must show: (1) that he was employed by the defendant; (2) that he was discharged; and (3) that he was discharged for exercising a job-related right to which he was entitled. *Kearl v. Portage Envtl., Inc.*, 205 P.3d 496, 499 (Colo. Ct. App. 2008) (citing *Lathrop*, 770 P.2d at 1373). Specifically, under the third prong, in order to survive summary judgment, a plaintiff must "present evidence that [his] termination was **causally connected to** [his] filing for benefits under workers' compensation." *Jackson v. Dillard's Dep't Stores, Inc.*, 92 Fed. App'x 583, 588 (10th Cir. 2003) (emphasis added); *see also Anderson v. Royal Crest Dairy, Inc.*, 281 F. Supp. 2d 1242, 1250 (D. Colo. 2003) ("the issue on summary judgment is whether [plaintiff] has come forward with sufficient evidence to create a triable issue of fact as to the retaliatory motivation"); *Wehrley v. Am. Family Mut. Ins. Co.*, 10-cv-01567, 2012 WL 415421, at *12 (D. Colo. Feb. 9, 2012) (unpublished) (same).

There is no dispute that Plaintiff has satisfied the first two elements. Thus, the only disputed issue is whether the Plaintiff's termination was causally connected to his filing a claim for workers' compensation benefits. Here, Plaintiff alleges that the Defendant's "tooth and nail" defense of the claim shows that Defendant was motivated to terminate him for retaliatory reasons. Specifically, Plaintiff asserts that (1) Defendant hired its own expert in defending against Plaintiff's workers' compensation claim; (2) Defendant's attorney, Petrock, refused to provide legal advice to Plaintiff regarding his claim; (3) Defendant refused to sign a letter stating that it would not contest Plaintiff's claim; and (4) Defendant refused to pay further medical and rehabilitation bills.

(Doc. # 20, ¶¶ 12, 13, 16, 21.)  Although neither Colorado courts nor the Tenth Circuit

have explicitly addressed this issue, other courts have come to the common-sense

conclusion that an employer's good faith contestation of a discharged employee's claim

does not establish discriminatory or retaliatory intent, because employers have the right

to raise good-faith defenses against such claims.  *Furrer v. Campbell's Soup Co.*, 403

N.W.2d 658, 660 (Minn. Ct. App. 1987) (citation and internal quotations omitted) (noting

that the purpose of state anti-retaliation law[15] was not to "provide a civil action . . .

anytime an employee made a claim for workers' compensation which the employer

or its insurance carrier, for whatever reason, contested.  Rather, the purpose of this

provision was to provide a cause of action for an employee when an employer or

insurance carrier used threats or coercion to discourage or prevent an employee from

pursuing a claim for workers' compensation"); *Axel v. Duffy-Mott Co.*, 389 N.E.2d 1075

(N.Y. Ct. App. 1979) ("absent unusual circumstances, no adverse inferences may be

drawn from [vigorous opposition to a claim] per se. The employer, too, has a right to

present its position . . . and should not be penalized for doing so.").

   Plaintiff has not provided any evidence that the Defendant did not act in good

faith in contesting his claim.  Thus, the Court finds that Defendant's defense of Plaintiff's

workers' compensation claim is not evidence of retaliation.  Furthermore, the fact that

---

[15]   Colorado does not have a similar law preventing retaliation by employers; rather, it provides employees with a common-law tort remedy for retaliation.  *Lathrop*, 770 P.2d at 1372.  However, the same underlying policy rationales for a statutory remedy – preventing threats or coercion – would also apply to a tort remedy.  *See id.* at 1372-73 (internal quotation omitted) (concluding tort relief for retaliation was necessary, because "to allow an employer to terminate the employment of an employee in retaliation for the employee's pursuit of a workmen's compensation claim would open the doors to 'coercion and other duress-provoking acts,' whereby employers could, by threat of retaliation, discourage or prevent employees from seeking the benefits due them.").

Petrock did not provide Plaintiff with legal advice in a case against the FFPD is not evidence of retaliation because of the obvious conflict of interest.  *See* Colo. Rules of Prof'l Conduct R. 1.13(a) & cmt. 10 ("A lawyer employed or retained by an organization represents the organization . . . .  There are times when the organization's interest may be . . . adverse to those of one or more of its constituents . . . when there is such adversity of interest, the lawyer for the organization cannot provide legal representation for that constituent individual.").

Plaintiff also points to two comments made by Corbin regarding his workers' compensation claim.  The first was in February of 2011: Plaintiff testified that Corbin asked "how I was doing, how things were coming along.  We discussed the fact again that, you know, filing a workman's comp claim and the cost incurred from that standpoint."  (Doc. # 20-1 at 207:2-5.)  Plaintiff also testified that, on the day he was terminated, Corbin asked him "how I was doing and how that [workers' compensation] case was coming."  (*Id.* at 205:13-17.)  However, these ambiguous comments do not reveal any sort of animus towards the Plaintiff's workers' compensation case, and they fall well short of demonstrating that there was a causal connection between his claim and his termination.

Lastly, there is no temporal proximity between Plaintiff's filing of his workers' compensation claim on October 17, 2010 (Doc. # 15-29), and his termination, more than five months later, on March 31, 2010 (Doc. #15-9).  *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three-month period of time between her protected activity and termination was insufficient to establish a causal connection for purposes of

retaliation); *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (four-month period between a plaintiff's participation in a protected activity and the alleged retaliatory action without more would be insufficient to support an inference of causation).

Thus, Plaintiff has not presented sufficient evidence to show that his filing of a workers' compensation claim was "causally connected to" his termination**,** *Jackson,* 92 F. App'x at 588, and the Defendant is therefore entitled to summary judgment on this claim.

## C.  PLAINTIFF'S PROCEDURAL DUE PROCESS CLAIM

Plaintiff's final claim is that his due process rights were violated when Defendant terminated him without providing a hearing.  The Fourteenth Amendment's Due Process Clause provides that no state shall "deprive any person of life, liberty or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Determining whether a Plaintiff was denied procedural due process involves a two-step inquiry: (1) did the individual possess a protected interest to which due process protection was applicable?; and (2) was the individual afforded an appropriate level of process?  *See Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998). Regarding the first step, "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."[16]

---

[16]  "The liberty interest that due process protects includes the individual's freedom to earn a living."  *Lentsch v. Marshall*, 741 F.2d 301, 303 (10th Cir. 1984).  However, Plaintiff fails to provide any evidence demonstrating that Defendant did anything more than terminate him (*e.g.*, he does not show that Defendant interfered with future employment prospects in some way), and accordingly Plaintiff fails to show he had a protectable liberty interest.  *Rooker*, 841 F. Supp. 2d at 1222 ("Plaintiff's liberty interest in practicing as an EMT–Paramedic is not implicated merely by his current employer suspending or terminating him.  More is needed.")

*Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). Therefore, the Court first considers

whether Plaintiff has provided evidence of a protected property interest.

A public employee may possess a protected property interest in his employment

if he has tenure, an explicit or implied contract for a fixed term of employment, or if state

law allows for his dismissal only for cause or its equivalent. *Darr v. Town of Telluride*,

495 F.3d 1243, 1251 (10th Cir. 2007); *see also Dickey v. Adams Cnty. Sch. Dist. No.

50*, 773 P.2d 585, 586 (Colo. App. 1988) (citing cases). However, Plaintiff has not

shown that any of these conditions existed here. In Colorado, absent one of these

conditions, an employee is presumed to be employed at-will and can be terminated

without cause or notice, and his termination does not give rise to a cause of action.

*Rooker v. Ouray Cnty.*, 841 F. Supp. 2d 1212, 1217 (D. Colo. 2012) (citing *Crawford

Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 546 (Colo. 1997)).

Additionally, the Colorado Supreme Court has held that a terminated public

employee may state a claim for relief for deprivation of property without due process

of law "if rules or mutually explicit understandings, which the public employer was

authorized to enact or make the basis of a binding agreement, create a sufficient

expectancy of continued employment to give the employee a legitimate claim of

entitlement." *Adams Cnty. Sch. Dist. No. 50 v. Dickey,* 791 P.2d 688, 695 (Colo. 1990).

"Courts addressing this issue have generally held that when state law recognizes that

---

*See also Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1269 (10th Cir. 1989) (because lawyer was not foreclosed from practicing law, he failed to state a deprivation of liberty interest); *Roth*, 408 U.S. at 573-74 (due process claim failed because "[t]he State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. . . . Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities.").

employee handbooks may form the basis of a contract action, the personnel policies and regulations in question determine whether the employee possessed a legitimate claim of entitlement under the due process clause." *Id.; see also Workman v. Jordan*, 32 F.3d 475, 479 (10th Cir. 1994) (relying on provision in employee handbook stating that plaintiff could be terminated only "for cause" to conclude that plaintiff had an interest in his continued employment).

However, the Employee Manual here clearly did not create a contract, nor a "sufficient expectancy of continued employment," between the parties. Rather, the Employee Manual has a prominent at-will disclaimer providing that:

> **These guidelines are not a contract** and impose no legally enforceable obligations on [D]istrict [sic]. **All District employees are employed at will.** Employees, or **District, may terminate the employment relationship at any time, with or without prior notice, warning, procedure, or formality, for any reason or no reason** . . . The nature, terms or conditions of District employees' employment cannot be changed by oral representation, custom, habit or practice, or any other writing. In the event of conflict between this disclaimer and any other statement, oral or written, present or future, concerning terms and conditions of employment, the at-will relationship confirmed by this disclaimer shall control.

(Doc. # 15-18 at 3) (emphasis added). The mere existence of an employment manual with hearing and review procedures is not adequate grounds for a property interest in continued employment – particularly when, as here, the Employee Manual explicitly and prominently disclaims contractual status and emphasizes that employees have at-will status. *See Rooker,* 841 F. Supp. 2d at 1217-18. Thus, Plaintiff has not shown a property interest in his continued employment. *See, e.g., Darr*, 495 F.3d at 1252 (relying on a statement in an employee handbook that "[n]othing in these policies is intended to modify the Town's at-will employment policy" and holding that the handbook

24

did not created a property interest in his continued employment, regardless of how

employer handled the termination); *Romero v. Denver Pub. Sch. Dist. No. 1*, No. 09-cv-

01043, 2010 WL 2943528, at *5, *9 (D. Colo. July 22, 2010) (unpublished) (concluding

that procedures in an employee handbook did not create a property interest in

employment in part because the manual prescribing the procedures contained a

disclaimer conspicuously stating that "[t]he procedures do not change the at-will status

of classified employees").

      Additionally, Plaintiff does not provide evidence that, notwithstanding the clear at-

will disclaimer in the Employee Manual, that the Board took any actions which created

an expectation that he was not an at-will employee.  In fact, he admitted in deposition

testimony that he understood he was an at-will employee.  (Doc. # 20-2 at 168:9-

169:15.)  Accordingly, Plaintiff had no sufficient expectation of continued employment,

and lacked any property interest that might flow from that expectation.  *Rooker*, 841

F. Supp. at 1220 (holding that plaintiff did not have due-process-protected property

interest, because he failed "to sufficiently plead a rule or other mutually explicit

understanding, from the Manual or otherwise, bridling the reason for which he could be

terminated and thereby creating a sufficient expectation of continued employment – the

critical component here. . . . Without alleging such a bridle, Plaintiff was an at-will

employee.  Consequently, he lacked a property interest in his continued employment.").

      The only property interest claimed here by Plaintiff, albeit obliquely, is his interest

not to be terminated without a grievance or hearing procedure, as provided by in the

Employee Manual.  (Doc. # 10, ¶ 43.)  However, Plaintiff's claim fails, because "without

a property interest in his continued employment . . . a right to . . . procedure is exactly that – an entitlement to nothing but a procedure." *Rooker*, 841 F. Supp. at 1220.   "[I]t is well established that 'an entitlement to nothing but procedure' cannot 'be the basis for a property interest.'" *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1085 (10th Cir. 2006) (quoting *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 764, (2005)); *see also Asbill v. Hous. Auth. of Choctaw Nation of Okla.*, 726 F.2d 1499, 1502 (10th Cir. 1984) ("By themselves, . . . procedural protections do not support a 'legitimate claim of entitlement' to future employment.").  This rule applies with equal force to procedural guarantees set forth in employee handbooks.  *Rooker*, 841 F. Supp. at 1220; *see also Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 990-91 (10th Cir. 1996) (internal quotations and citations omitted) ("[employees] also contend that procedural guidelines in the Faculty Handbook effectively created a property interest in reappointment, of which they could be divested only according to the terms of the specified procedures. This tautological argument fails because it attempts to construct a property interest out of procedural timber . . . .  The university's promise that it would follow certain steps in considering the professors' reappointment did not beget a property interest in reappointment.").

Because Plaintiff has not shown that he had a property interest in his continued employment, summary judgment is appropriate on his procedural due process claim.

## IV.  **CONCLUSION**

Based on the foregoing, it is ORDERED that Defendant's Motion for Summary Judgment (Doc. # 15) is GRANTED.

It is FURTHER ORDERED that this case is DISMISSED WITH PREJUDICE.

The Final Trial Preparation Conference set for March 22, 2013, and the five-day Jury

Trial set to commence on April 1, 2013, are VACATED.

It is FURTHER ORDERED that Defendant shall have its costs by the filing of a

Bill of Costs with the Clerk of the Court within fourteen days of the entry of judgment.

Each party shall bear its own attorneys' fees.

DATED: November __05__, 2012

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge